FILED 01 DEC '14 11:05USDC-ORP

Conrad Robert Engweiler
17650 Mountain View Road
Sisters, Oregon 97759
Phone: (541) 588-2317
Email: cengweiler@gmail.com

Plaintiff, *pro se*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

**CONRAD R. ENGWEILER,**

Plaintiff,

v.

**MITCH MORROW, COLETTE S. PETERS, HEIDI STEWARD, CHANE GRIGGS, GUY HALL, BETHANY SMITH, MERILEE NOWAK, THERESA ARENDELL, TIM WELSH, JANET R. "BIRDIE" WORLEY, ROB PERSSON, WENDY HATFIELD, COLLEEN TAYLOR, TAYNIA BEAL, JEFRY VAN VALKENBURG, HERBERT LOVEJOY, JEREMY RICE, BRENDA CARNEY, DEREK LOWE, JOHN AND JANE DOES 1-20,**
each sued in their individual and official capacities,

Defendants.

$6`14-CV-1917 \ AA$

USDC Case No. _____

COMPLAINT
Violation of Civil Rights
(42 U.S.C. § 1983) - Declaratory,
Injunctive, Damages Relief

Jury Trial Demanded

## INTRODUCTORY STATEMENT

1.  This is an action brought by Plaintiff Conrad R. Engweiler pursuant to 42 U.S.C.

§ 1983, alleging violations of his constitutional rights related to the deprivation of his liberty

interests in earned time credits ("ETC") and adjusted release date. Defendants acted with

deliberate indifference to the violation of Plaintiff's constitutional rights. Defendants violated the

due process and *ex post facto* clauses, and they retaliated against him for his protected conduct.

Defendants have engaged in a civil conspiracy to violate Plaintiff's constitutional rights. Plaintiff

seeks declaratory and injunctive relief, nominal, compensatory and punitive damages and

reasonable costs and attorney's fees, pursuant to 42 U.S.C. §1988.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiff's claims of violation of federal

constitutional rights under 28 U.S.C. §§ 1331 and 1343.

3.      Venue is proper under 28 U.S.C. § 1391(b), in that one or more of the defendants

reside in the District of Oregon and Plaintiff's claims for relief arose in this district.

## PARTIES

4.      Plaintiff CONRAD R. ENGWEILER was a prisoner of the Oregon Department of

Corrections ("ODOC"). During all times relevant, he was confined at the Oregon State

Correctional Institution ("OSCI") in Salem, Oregon.

5.      Defendant COLETTE S. PETERS is and was at all times relevant the Director of

the ODOC. She is responsible, as defined by statute, for providing programs for the delivery to

the public of the services assigned to the department; organizing the ODOC in whatever manner

she deems necessary to conduct the work of the ODOC; appointing all subordinate

superintendents, officers and employees; delegating to departmental employees such

responsibilities and authority as she determines to be necessary; providing for the safety of all

prisoners in the custody of ODOC; and adopting rules for the government and administration of

the ODOC. She has been personally involved in the violations alleged herein. She is sued in her

official and individual capacities.

6. Defendant MITCH MORROW was at all times relevant the Deputy Director of the ODOC. He has the full authority to act for the director, subject to the directions of the director. He was a policy maker for ODOC. He has been personally involved in the violations alleged herein. He is sued in his official and individual capacities.

7. Defendant HEIDI STEWARD was at all times relevant the Government Efficiencies and Communications Administrator for ODOC. She is a policy maker for ODOC. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

8. Defendant CHANE GRIGGS was at all times relevant the Offender Management and Rehabilitation Assistant Director for ODOC. She is a policy maker for ODOC. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

9. Defendant GUY HALL was at all times relevant the Education, Programs, Treatment Administrator for ODOC. He is a policy maker for ODOC. He has been personally involved in the violations alleged herein. He is sued in his official and individual capacities.

10. Defendant BETHANY SMITH was at all times relevant the Offender Information Sentence Computation ("OISC") Administrator for ODOC. She was responsible for the delivery of program services and coordination of program operations at OISC. She is a policymaker for OISC. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

11. Defendant MERILEE NOWAK was at all times relevant the OISC Policy Manager for ODOC. She is a policymaker for OISC. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

12.     Defendant THERESA ARENDELL was at all times relevant the OISC Prison

Term Analyst Manager for ODOC, and responsible for calculating, applying, and verifying ETC

and release dates pursuant to applicable rules and statutes. She has been personally involved in

the violations alleged herein. She is sued in her official and individual capacities.

13.     Defendant TIM WELSH was at all times relevant an OISC Prison Term Analyst

("PTA") for ODOC. At all times relevant he was responsible for calculating and applying ETC

and establishing release dates pursuant to applicable rules and statutes. At all times relevant,

Defendant Welsh was assigned as Plaintiff's PTA. He has been personally involved in the

violations alleged herein. He is sued in his official and individual capacities.

14.     Defendant JANET R. "BIRDIE" WORLEY was at all times relevant the Rules

Coordinator for ODOC. She is responsible for promulgating and maintaining ODOC's rules and

policies. She is also responsible for providing information to the public about the ODOC's

rulemaking proceedings and the status of its rules. She has been personally involved in the

violations alleged herein. She is sued in her official and individual capacities.

15.     Defendant ROB PERSSON was at all times relevant the OSCI Superintendent for

ODOC; and he was at relevant times the Administrator of OISC. He is responsible for the

orderly operation of OSCI and the training and supervision of all subordinate staff.  He was

responsible for the delivery of program services and coordination of program operations at OISC

and was a policymaker at OISC. He has been personally involved in the violations alleged

herein. He is sued in his official and individual capacities.

16.     Defendant WENDY HATFIELD (presently known as WENDY SMITH) was at

all times relevant the Executive Assistant to the Superintendent for OSCI. She has been

personally involved in the violations alleged herein. She is sued in her official and individual capacities.

17.     Defendant COLLEEN TAYLOR was at all times relevant the OSCI Diversity Coordinator for ODOC. She was responsible for processing inmate grievances and complaints. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

18.     Defendant TANYIA BEAL was at all times relevant an OSCI Counselor for ODOC. Her responsibilities include: developing an assigned inmate's Oregon Corrections Plan ("OCP") and release plan; accessing and documenting in ODOC's computer records (i.e., "Corrections Information System" or "CIS"), during specified review periods, whether inmates are in compliance with their OCP and maintaining appropriate institutional conduct; and applying ETC. Defendant Beal is and was at all times relevant Plaintiff's correctional counselor at OSCI. She has been personally involved in the violations alleged herein. She is sued in her official and individual capacities.

19.     Defendant JEFRY VAN VALKENBURG was at all times relevant a Senior Assistant Attorney General employed by the Oregon Department of Justice ("DOJ") and assigned to the Government Services section of DOJ, serving as general counsel for ODOC. At all times relevant he was a de facto policymaker for OISC and ODOC. He has been personally involved in the violations alleged herein. He is sued in his official and individual capacities.

20.     Defendant HERBERT LOVEJOY was at all times relevant an Assistant Attorney General at the DOJ and assigned to the Government Services section of DOJ, serving as general counsel for ODOC. At all times relevant he was a de facto policymaker for OISC and ODOC. He

has been personally involved in the violations alleged herein. He is sued in his official and individual capacities.

21.     Defendant JEREMY RICE was at all times relevant an Assistant Attorney General at the DOJ and assigned to the Appellate Division of DOJ, serving as counsel for ODOC and the Oregon Board of Parole and Post-Prison Supervision ("BOPPPS"). At all times relevant he was a de facto policymaker for OISC, ODOC and BOPPPS. He has been personally involved in the violations alleged herein. He is sued in his official and individual capacities.

22.     Defendant BRENDA CARNEY was at all times relevant the executive director of the BOPPPS. She is sued in his official and individual capacities.

23.     Defendant DEREK LOWE i was at all time relevant a correctional staff sergeant at OSCI. He is sued in his official and individual capacities.

24.     Defendant JOHN and JANE DOES # 1-20 are and were at all times relevant, employees of the ODOC, DOJ, BOPPPS, and/or other state officials whose identities are currently unknown to Plaintiff. All Doe Defendants have been personally involved in the violations alleged herein. Plaintiff will amend this complaint to formally name all Doe Defendants once their identities are revealed to Plaintiff in discovery. All Doe Defendants are sued in their official and individual capacities.

25.     Defendants have acted under color of state law at all times relevant to this complaint.

26.     At all times relevant a civil conspiracy existed between two or more Defendants to violate Plaintiff's constitutional rights as alleged herein.

## FACTUAL ALLEGATIONS

### Plaintiff's Former Litigation Activities Involving Defendants

27.     On February 21, 1990, Plaintiff committed aggravated murder, when he was fifteen years of age. He was tried as an adult, convicted of his crime, and sentenced to life imprisonment with a life term of post-prison supervision. Under ORS 161.620 (1989), Plaintiff's sentence required that he have the possibility of parole or release.

28.     On or about April 10, 1991, Plaintiff began serving his life sentence in ODOC custody.

29.     The BOPPPS had a legal duty under ORS 144.120(1) (1989) to conduct a parole hearing for Plaintiff within the first year of his confinement in ODOC to decide whether to set an initial release date. The BOPPPS refused to conduct Plaintiff's parole hearing or decide whether to set his release date.

30.     In 1999, the BOPPPS promulgated and retroactively applied rules – known as the Juvenile Aggravated Murder or JAM rules – to Plaintiff that deprived him of parole or release eligibility for a minimum of 40 years. The BOPPPS imposed a prison term of 480 months under those rules.

31.     On or about August 23, 2000, Plaintiff wrote the OSCI Records Department requesting "a reduction of his [480-month] prison term be made pursuant to ORS 421.121 and OAR chapter 291 Division 97."

32.     OISC is the organizational component (i.e., "functional unit") within the ODOC charged by the ODOC director to administrate applicable statutes pertaining to sentencing; develop, implement and revise applicable processes for inmate and offender sentence

computation; respond to public information requests with regard to inmate and offenders; and certify an inmate's release date.

33.     On or about August 29, 2000, an OSCI Records Staff responded to Plaintiff's August 23, 2000, request, stating: "The Department of Corrections does not calculate the release date on your life sentences. As you know, that date will be determined by the BOPPPS. You would need to address any concerns regarding the prison term established by the BOPPPS directly to them."

34.     On or about July 10, 2001, Plaintiff wrote to OISC Administrator Charles Kliewer ("Kliewer") requesting a reduction to his 480-month prison term pursuant to ORS 421.121 (1989).

35.     On or about October 8, 2001, Plaintiff filed an alternative writ of mandamus in Marion County Circuit Court against Kliewer and ODOC Director Dave Cook ("Cook"), seeking an order commanding them to grant Plaintiff an ETC reduction of his 480-month prison term under ORS 421.121. *See State ex rel Engweiler v. Cook*, Marion County Circuit Court Case No. 01C19211.

36.     On or about December 20, 2001, Defendant Smith wrote Plaintiff to inform him that OISC "was unable to address the issues raised in [his] July 10, 2001, letter due to pending litigation."

37.     A copy of Defendant Smith's December 20, 2001, letter was placed in Plaintiff's ODOC sentencing and institution file.

38.     On December 21, 2001, the circuit court dismissed Plaintiff's alternative writ of mandamus based on Cook and Kilewer's argument that ETC does "not apply to inmates serving life sentences."

39.     On January 12, 2005, the Oregon Court of Appeals affirmed the circuit court's

decision, reasoning that the phrase "term of incarceration" in ORS 421.121 "means the

incarcerative term imposed by the court as part of the sentence" and not a prison term established

by the BOPPPS. *See State ex rel Engweiler v. Cook*, 340 Or. 373, 133 P.3d 904 (2006)

(*Engweiler I*).

40.     On or about April 13, 2006, the Oregon Supreme Court in *Engweiler I*

authoritatively held that Plaintiff is entitled to a reduction in his "term of incarceration" unde

ORS 421.121(1)(a) based on appropriate institutional behavior. The Court rejected the reasoning

of the Court of Appeals that the phrase "term of incarceration" means only those terms of

incarceration imposed by a court as part of a sentence. *Id.* at 380. The Court found that ORS

421.121 contains no explicit exception for inmates sentenced to life imprisonment, and that

ODOC's "duty to reduce the 'term of incarceration' is mandatory for each inmate" who behaves

appropriately as defined by statute. *Id.* The Court affirmed the lower court decision, finding that

the 480-month term was not Plaintiff's "term of incarceration," but unambiguously stated that

"[i]f the [BOPPPS] does set petitioner's parole release date, it also will have defined his 'term of

incarceration'." *Id.* at 383.

41.     Neither Kilewer nor Cook exercised their right to seek reconsideration of

*Engweiler I.*

42.     On information and belief, Defendant Persson was the Administrator of OISC on

or about the time *Engweiler I* was decided.

43.     Neither Defendants Persson nor Smith responded to Plaintiff's July 10, 2001 letter

to Kliewer after *Engweiler I* was decided.

44.     On or about May 12, 2008, the Marion County Circuit Court issued a peremptory writ of mandamus directing the BOPPPS to conduct a parole hearing "forthwith" and set an initial release date for Plaintiff under ORS 144.120(1)(a) (1989). *See State ex rel Engweiler v. Powers,* Marion County Circuit Court Case No. 07C1859. In reaching its decision, the circuit court agreed with Plaintiff that his right to a release date arose, in part, because of his right to ETC under ORS 421.121.

45.     Defendants, by and through Defendant Rice, appealed the circuit court decision. *See State ex rel Engweiler v. Powers,* Court of Appeals Case No. A139059.

46.     On or about July 17, 2008, the BOPPPS, by and through Defendant Rice, moved the Court of Appeals for a stay of the circuit court's judgment in *State ex rel Engweiler v. Powers, supra.* In support of its motion, Defendant Rice argued that Plaintiff would not be harmed if a stay were granted because, "[e]ven if the board applied ORS 144.120, any *release* date the board sets is will [*sic*] likely be later than 2030, and thus, unlikely to fall within the time that it will take to process an appeal to conclusion." Plaintiff opposed the stay motion, arguing, in part, that Defendant Rice's statement demonstrated prejudgment, vindictiveness, and arbitrary administrative action in deciding his release date.

47.     On or about August 8, 2008, the Court of Appeals denied the BOPPPS's motion for a stay, declaring in part that Plaintiff is "correct that the board's ultimate decision regarding a parole release date should not be prejudged."

48.     On or about September 12, 2008, Defendant Worley filed with the Secretary of State ("SOS") a notice of permanent rulemaking and emergency temporary administrative rules, which included *former* OAR 291-097-0005(3)(e). That rule provided: "It is the policy of the

Department of Corrections to not calculate earned time for . . . inmates serving . . . sentences of . . . life with the possibility of parole."

49.     Defendant Worley knew, or reasonably should have known, that OAR 291-097-0005(3)(e) was inconsistent with ORS 421.121 as authoritatively construed in *Engweiler I* and that the retroactive application of that rule to Plaintiff would be invalid and *ultra vires* because it violated ORS 421.121 and Plaintiff's constitutional rights, as alleged herein. *See* ORS 183.400(4)(a)-(b) (rule shall be declared invalid if it violates constitution or statutory authority of the agency).

50.     On or about October 22, 2008, the BOPPPS adopted OAR 255-032-0006 (temp) to comply with the circuit court's judgment in *State ex rel Engweiler v. Powers, surpa.* The BOPPPS stated in the rulemaking notice that it "disagreed with the circuit court's order." Plaintiff was the only offender actually affected by the rule.

51.     On information and belief, Defendants Rice and Doe(s) directed the BOPPPS to promulgate OAR 255-030-0006 (temp) for the malicious purpose of imposing a release date on Plaintiff that would "likely be later than 2030."

52.     On or about March 10, 2009, Defendant Worley filed with SOS for permanent adoption *former* OAR 291-097-0005(3)(e), *renumbered as* OAR 291-097-0200(3)(e) (2013). By separate temporary rule filed with SOS by Defendant Worley, *former* OAR 291-097-0005(3)(e) was made effective as of August 4, 2008. *Former* OAR 291-097-0005(2) (temp) (3-10-09). That effective date is four days prior to the Court of Appeals order denying the BOPPPS's stay motion in *State ex rel Engweiler v. Powers, supra.*

53.     *Former* OAR 291-097-0005(3)(e) did not include a retroactivity provision. Plaintiff therefore reasonably presumed and believed the rule did not have retroactive effect.

54.     On information and belief, Defendants Rice and Doe(s) directed and/or advised Defendant Worley to promulgate *former* OAR 291-097-0005(3)(e) for the malicious or otherwise improper purpose of denying Plaintiff ETC and to create a pretextual basis for relitigating *Engweiler I*.

55.     In approximately May 2009, Defendant Rice, acting as counsel for the BOPPPS, sought reconsideration of the Court of Appeals' denial of a stay in *State ex rel Engweiler v. Powers, surpa*, arguing that a stay should be granted because it "presumes that [Plaintiff] will petition ODOC for earned time credit" based on *Engweiler I* if the BOPPPS is required to set his release date, and that this would result in a "costly and time-consuming administrative process" for the ODOC.

56.     Based on Defendant Rice's argument alleged in paragraph 55, *supra,* Defendants Rice and Doe(s) knew, or reasonably should have known, on May 2009 that Plaintiff would petition for ETC after the BOPPPS set his release date and that *Engweiler I* supported his claim.

57.     On or about November 25, 2009, the Oregon Court of Appeals reversed and remanded the circuit court's judgment ordering the BOPPPS to conduct a parole hearing for Plaintiff. *See State ex rel Engweiler v. Powers, sub nom. Felton*, 350 Or. 592, 260 P.3d 448 (2011) (*Engweiler II*).

58.     In 2010, Defendant Worley spoke with Plaintiff in the OSCI law library, stating that she had met with Plaintiff's father, Glenn Engweiler ("G. Engweiler"), at a rulemaking hearing initiated by Plaintiff's family in 2004 or 2005. She told Plaintiff that she wanted to make clear that ODOC was not behind denying him ETC or a release date. Defendant Worley said that "other people" were making those decisions.

59.    On or about September 1, 2011, the Oregon Supreme Court reversed the decision

of the Court of Appeals and affirmed the circuit court's issuance of the peremptory writ of

mandamus in *Engweiler II*. The Court also held that the JAM rules "exceed[ed] the [BOPPPS']

rulemaking authority and are invalid, because they conflict with the statutes requiring the

[BOPPPS] to conduct a parole hearing and set an initial release date for them[.]" *Id.* at 627.

60.    Between approximately September 1, 2011, and February 10, 2012, the Advisory

Commission on Prison Terms and Parole Standards ("Commission") was convened in response

to *State ex rel Engweiler v. Felton, supra*, and held meetings for the purpose of drafting and

proposing rules establishing prison term ranges for Plaintiff and other juvenile offenders who

were convicted of aggravated murder. Defendants Morrow, Rice and Doe(s) attended and

participated in those meetings. At the request of the Commission, Defendant Rice spoke as a

legal expert on the *Engweiler* cases.

61.    On or about March 20, 2012, the BOPPPS conducted Plaintiff's parole hearing

pursuant to ORS 144.120, and established a February 22, 2018 parole release date and a 336-

month term of incarceration for Plaintiff. In establishing this term, the BOPPPS made findings of

aggravation not previously found using the same rules (i.e., OAR 255, Ex. E) that it applied to

Plaintiff in setting his prison term under the JAM rules in 1999.

62.    On or about March 21, 2012, Defendant Hatfield, who attended and facilitated

Plaintiff's parole hearing for ODOC, told him that the BOPPPS's prison term decision was "fair

for everyone" and Plaintiff should not challenge it.

**Defendants' Unconstitutional Conduct Giving Rise to § 1983 Claims**

*Defendants' Unperformed Duties that Caused the Deprivation of Plaintiff's Rights*

63.     ODOC had a mandatory duty under ORS 421.121(4) to adopt rules pursuant to the Administrative Procedures Act ("APA") rulemaking provisions of ORS chapter 183 to establish a process for granting, retracting and restoring ETC for eligible inmates.

64.     At all times relevant, Defendants Peters, Morrow, Worley, Smith, Nowak, and Doe(s) were and are responsible for adopting rules in accordance with ORS 421.121(4).

65.     Defendants Peters, Morrow, Worley, Smith, Nowak, and Doe(s) failed and/or refused to comply with their legal duties under ORS 421.121(4), to the extent ODOC rules did not provide or establish a process for granting, retracting, and restoring Plaintiff's ETC.

66.     Pursuant to ORS 421.121 (1989) and *Engweiler I*, ODOC had a legal duty to reduce Plaintiff's 336-month term of incarceration once the BOPPPS set his parole release date.

67.     Following BOPPPS' decision concerning the prison term of an inmate, OAR 255-030-0005(1) required BOPPPS to send written notice of the final order to the ODOC.

68.     By long-standing policy and rule, OISC calculates and applies each eligible inmate's ETC automatically and without requiring the inmate to request that it do so.

69.     Until on or about August 17, 2009, ODOC and OISC officials entered and calculated Plaintiff's ETC in ODOC's computer system.

70.     ODOC and OISC officials never informed Plaintiff that his ETC was no longer being calculated or entered in ODOC's computer system on or after August 17, 2009.

71.     At all times relevant, Defendants Beal and Doe(s) are and were responsible for entering into ODOC's computer system necessary information concerning Plaintiff's compliance

with his Oregon Corrections Plan ("OCP") and appropriate institutional behavior, which OISC relies on to calculate and apply ETC.

72.     At all times relevant, Defendants Smith, Arendell, Welsh and Doe(s) were responsible for calculating and applying Plaintiff's ETC to his term of incarceration, and ensuring that Plaintiff's release date is correctly established.

73.     Defendants Smith, Arendell, Welsh, Beal and Doe(s) knew, or reasonably should have known, of their legal duties under ORS 421.121, as authoritatively interpreted by the Oregon Supreme Court in *Engweiler I.*

74.     Defendants Smith, Arendell, Welsh, Beal and Doe(s) failed and/or refused to comply with their legal duties, described above, after Plaintiff's March 20, 2012 BOPPPS decision establishing his 336-month term of incarceration.

75.     Had Defendants Smith, Arendell, Welsh, Beal and Doe(s) properly and timely performed their legal duties, described above, Plaintiff's February 22, 2018 release date would have been reduced to, and could have been scheduled by the BOPPPS for, July 17, 2012.

76.     Had Defendants Smith, Arendell, Welsh, Beal and Doe(s) properly and timely performed their legal duties, described above, Plaintiff would have been entitled to release on July 17, 2012, unless before that date BOPPPS deferred his release as authorized under ORS 144.125. *See* ORS 144.245(1).

### *Plaintiff's Notice to Defendants of Wrongful Practices and Harmful Consequences*

77.     On or about July 16, 2012, ODOC rules (OAR chapter 291) did not provide any express written procedures governing the process for, or disposition of, challenges to administratively established release dates.

78.     On or about July 16, 2012, Plaintiff sent an inmate communication form ("kite")
to Defendants Smith and Welsh, informing them that they had miscalculated his incarceration
term due to their failure to apply time served credit and ETC. Plaintiff explained that his
February 22, 2018, release date should have been recomputed for July 17, 2012, with the
application of those credits. Plaintiff explained that the Oregon Supreme Court in *Engweiler I*
interpreted ORS 421.121 (1989) as applying to his term of incarceration and requiring OISC
officials to reduce his incarceration term by 20 percent based on his years of appropriate
institutional behavior.

79.     On or about July 17, 2012, inmate Shane I. Sopher sent a kyte to OISC requesting
ETC and the adjustment of his release date pursuant to *Engweiler I*. Sopher identified to OISC
officials that he was entitled to release.

80.     On or about July 18, 2012, Plaintiff, through his attorney, mailed and emailed a
letter to Defendants Smith and Welsh asserting his claim for time served/ETC and release as of
July 17, 2012. Plaintiff's attorney mailed a copy of this letter to Assistant Attorney General
Thomas Castle ("Castle"), who was the ODOC's trial counsel in both *Engweiler I* and *State ex
rel Engweiler v. Powers, supra*. This letter provided a proposed release plan.

81.     On or about July 18, 2012, Plaintiff met with Defendant Beal and informed her
that his incarceration term had been miscalculated by OISC and that he was entitled to release on
July 17, 2012. Plaintiff explained *Engweiler I* to Defendant Beal and asked if she would like to
read it. She declined and informed Plaintiff that OISC was responsible for addressing release
date issues. Defendant Beal told Plaintiff to wait for a response from OISC.

82.     At Plaintiff's request, on or about July 18, 2012, Defendant Beal verified that
Plaintiff had been in full compliance with the ODOC's rules of appropriate institutional

behavior, that if he was eligible for ETC he would likely receive a full 20 percent reduction. Defendant Beal provided Plaintiff a printout of the ODOC Corrections Information Systems ETC Form.

83.     On or about July 18, 2012, OSCI lead counselor Shawn Cost ("Cost") provided Plaintiff a second copy of his Corrections Information Systems ETC Form. That document shows that Plaintiff had earned 1352.75 days of ETC, from the dates of October 24, 1994, to August 17, 2009. Cost informed Plaintiff that his ETC had not been calculated on the ODOC computer system prior to October 24, 1994, because ODOC records showed he had been resentenced on November 28, 1994.

84.     As of July 18, 2012, ODOC's Corrections Information Systems established that between October 24, 1994, and August 17, 2009, Plaintiff had earned 1352.75 days of ETC, which, as applied to his February 22, 2018, release date, entitled him to an adjusted release date of approximately June 7, 2014.

85.     On or about July 19, 2012, Plaintiff spoke with Defendant Taylor about his claim to ETC and immediate release, and gave her a copy of *Engweiler I*. Defendant Taylor told Plaintiff she would immediately look into the matter and that Plaintiff should consider filing a grievance because it would allow her to communicate to OISC and expedite resolution of his claim.

86.     On or about July 19, 2012, acting on Defendant Taylor's advice and directive, Plaintiff filed a grievance against Defendant Welsh, restating that his release date had been miscalculated and that Plaintiff was entitled to release as of July 17, 2012, specifically identifying *Engweiler I* as controlling, and requesting a hearing and other due process if ODOC disputed his claim. *See* ODOC Grievance Complaint No. OSCI_2012_07_027 A.

87.     Upon receipt of Plaintiff's grievance, Defendant Taylor told Plaintiff that she would "fast-track" the process by setting a fourteen (14) day response time.

88.     On or about July 19, 2012, Plaintiff advised Defendant Hatfield of his claim to release. Defendant Hatfield informed Plaintiff that she had worked at OISC and, in her opinion, Defendant Smith was "very detailed oriented" and would take Plaintiff's claim serious.

89.     On or about July 19, 2012, Plaintiff sent a kite to Defendant Smith confirming his July 18, 2012 conversation with Defendant Beal, alleged in paragraph 81, *supra*.

90.     On or about July 20, 2012, Defendant Taylor met with Plaintiff in the OSCI law library and informed him that she spoke to Defendant Smith regarding his claim. Defendant Taylor said Defendant Smith told her that Plaintiff's interpretation of the ETC law was "wrong." Defendant Taylor informed Plaintiff that Defendant Smith said that pursuant to OISC policy ETC did not apply to someone like Plaintiff because he was serving a life sentence for aggravated murder. Defendant Taylor said she told Defendant Smith that she had read the Oregon Supreme Court's decision in *Engweiler I* and disagreed with OISC's position and agreed with Plaintiff. Defendant Taylor told Plaintiff that Defendant Smith said someone at OISC was "very familiar" with how the "juvenile laws" worked and that "he" had confirmed OISC's interpretation of the law. Defendant Taylor said Defendant Smith told her that the only thing "those juveniles were entitled to was parole hearings."  Defendant Taylor said Defendant Smith told her that OISC would respond to Plaintiff's July 16, 2012 kite "shortly."

91.     On or about July 21, 2012, Plaintiff sent a kite to Defendants Worley and Nowak requesting to copy or inspect the OISC policy that Defendant Smith told Defendant Taylor precluded ETC. In his kite, Plaintiff informed both Defendants Worley and Nowak that if such a policy existed it was inconsistent with *Engweiler I* and invalid.

Page 18 of 59 – COMPLAINT

92.    On or about July 23, 2012, G. Engweiler informed Plaintiff that he contacted Defendant Smith by telephone. He informed Plaintiff that Defendant Smith told him that, per OISC policy, ETC did not apply to Plaintiff because he was serving a life sentence. He said he told Defendant Smith that Plaintiff received a release date in March of that year and that, in 2006, the Oregon Supreme Court in *Engweiler I* held that ODOC was required to apply ETC to his release date. He said Smith stated she did not know of any 2006 Oregon Supreme Court decision involving Plaintiff, but that she would look into it and he should call her back on July 25, 2012.

93.    On or about July 23, 2012, Plaintiff spoke with Defendant Taylor in the OSCI Unit 11 dayroom and informed her that G. Engweiler said Defendant Smith denied knowing about *Engweiler I*. Defendant Taylor said that was not true because she had personally mailed Defendant Smith a copy of it and Smith had mentioned it when they last spoke. Defendant Taylor said that Defendant Smith knew Plaintiff as one of the "Oregon Five" and suggested that she had an unfavorable opinion of him. Plaintiff asked Defendant Taylor if she would have a problem if Plaintiff informed Defendant Smith of this inconsistency. She said she did not.

94.    On or about July 23, 2012, Plaintiff sent a kite to Defendant Smith asking her to clarify whether she informed G. Engweiler that she was unaware of *Engweiler I* and whether she discussed that case with Defendant Taylor prior to speaking with G. Engweiler.

95.    On or about July 24, 2012, Plaintiff's attorney contacted Castle by email and requested an update. Castle informed him that OISC needed until July 31, 2012 to respond, because that was when Defendant Nowak returned from vacation.

96.    On or about July 24, 2012, G. Engweiler contacted Defendant Smith and requested a copy of the OISC "policy" she identified in their July 23, 2012 phone conversation.

Defendant Smith told him to call her back in two days. G. Engweiler requested her email address for future communication. Defendant Smith told him that she could not provide it to him.

97.    On or about July 24, 2012, Plaintiff spoke with Defendant Hatfield in the OSCI library. She showed Plaintiff a version of the OISC Master Policy Manual ("OISC Manual"), which included a section governing ETC for inmates convicted of aggravated murder. Defendant Hatfield pointed out that the OISC Manual provided that once the inmate's sentence is converted to life with the possibility of parole, ETC apply. Defendant Hatfield said she could not give Plaintiff a copy of the policy but that Plaintiff should make a public records request. She told him that she spoke to Defendant Smith, who told her Plaintiff's 2005 Court of Appeals' decision in *Engweiler I* stated ETC do not apply to Plaintiff because he was serving a life sentence. Plaintiff showed Defendant Hatfield his 2006 Oregon Supreme Court decision and explained that it clearly stated ETC apply to his parole release date and that his life sentence is irrelevant. Hatfield said she was "astonished" that Defendant Smith had not read that decision. She said she wondered whether Defendant Smith really did not know about it. Plaintiff told her that Plaintiff had provided Defendant Smith a copy the 2006 Oregon Supreme Court decision in *Engweiler I* as did Defendant Taylor. Defendant Hatfield said that the "good news" is that it had been referred to Defendant Lovejoy in the DOJ for a final determination. Defendant Hatfield said it was clear Plaintiff was entitled to ETC, but his "politics" may push the ODOC to "fight [him]."

98.    The OISC Manual, which is a public record, is not available or maintained in OSCI legal library; and OISC requires inmates to first request and pay a fee before OISC will provide copies or otherwise allow inmates to inspect it.

99.    On or about July 26, 2012, Defendant Worley responded to Plaintiff's July 22, 2012 kite, denying any knowledge of a "policy" purportedly precluding the application of ETC

Page 20 of 59 – COMPLAINT

to juveniles convicted of aggravated murder. She forwarded a copy of Plaintiff's kite to Defendant Smith.

100.    On July 26, 2012, G. Engweiler attempted to contact Defendant Smith, but she did not return his phone call.

101.    On or about July 26, 2012, Defendant Taylor contacted Plaintiff by phone at the OSCI law library. She told Plaintiff that Defendant Smith had received his July 23, 2012 kite asking for clarification about what she said to G. Engweiler and Defendant Taylor about *Engweiler I*. Defendant Taylor said that Plaintiff "got her in hot water" and "threw her under the bus." Contrary to what Defendant Taylor told Plaintiff on July 20, 2012, she now claimed that she had not spoken to Defendant Smith about his 2006 Oregon Supreme Court decision or an OISC policy. Defendant Taylor said she must have spoken to someone else who was a manager at OISC, whose name she could not recall. Defendant Taylor said that Defendant Smith was going on vacation and that Defendant Nowak would be responsible for responding to Plaintiff's grievance.

102.    On or about July 30, 2012, Defendant Hatfield informed Plaintiff that Defendant Smith had left a message on July 27, 2012, stating that OSCI could involve him in pre-release transitional programs. Defendant Hatfield also said Defendant Smith stated that a final decision would be made that week.

103.    On or about July 30, 2012, Defendant Taylor informed Plaintiff that OISC had a meeting scheduled that week and it involved four (4) DOJ lawyers. She said that it "amazed" her that there was any dispute about his claim in light of the Oregon Supreme Court's decision. She said she was not upset with Plaintiff for "outing" her to Defendant Smith. She said that "you guys are right and someone needs to say so."

Page 21 of 59 – COMPLAINT

104. On or about August 2, 2012, Defendant Hatfield informed Plaintiff that "things were in process" and that "[Plaintiff] could expect to be released at any time."

105. On or about August 2, 2012, Sopher, who had also requested OISC to provide his ETC and release, informed Plaintiff that he read an email from OISC PTA Tasha Black to OSCI Recreation Staff Jesse Hale. Sopher said that the email stated that he was correct about his ETC, and that he may receive a reduction to his release date.

106. On or about August 2, 2012, Sopher told Plaintiff that OSCI Recreation Staff John Sipple ("Sipple") said that Sopher would likely be released soon.

107. On or about August 2, 2012, OSCI Staff Lt. Norton and Cpl. Gurrerro informed Plaintiff that they had been told that he was going to be released soon.

108. On or about August 3, 2012, Defendant Beal informed Plaintiff by phone that, per OISC instruction, she was entering his ETC information into the ODOC computer system and that everything was in process and Plaintiff should have a final decision soon.

109. On or about August 3, 2012, Sopher told Plaintiff that OSCI Correctional Officer Mahoney told him that Kathy Mahoney, Management Assistant to the Superintendent, was working extra hard to prepare for Sopher's and Plaintiff's release from prison.

110. On or about August 6, 2012, Sopher told Plaintiff that Sipple informed him that the DOJ is "calling the shots" and that he will be called to his counselor's office when or if they order his release.

111. On or about August 6, 2012, Plaintiff's attorney sent an email to OISC asking for an update on when a response would be given.

112.    On or about August 7, 2012, Plaintiff spoke to Defendant Beal in the hallway and asked if she would be available to meet with him that day. She said she did not know because she was busy, but she had received his kite and would respond to it.

113.    Defendant Beal's tone and demeanor made it clear to Plaintiff that she did not want to speak with Plaintiff and she was eager to end their interaction.

114.    On or about August 7, 2012, Plaintiff's attorney told Plaintiff that he spoke to Castle who agreed to contact Defendant Nowak and ask her to respond to his August 6, 2012 email. He also said that Castle told him that Defendant Lovejoy was in charge.

115.    On or about August 7, 2012, Defendant Hatfield informed Plaintiff that she spoke to Defendant Nowak on August 3, 2012. She said Defendant Nowak told her that she needed the DOJ to answer a few questions. Hatfield said that it was her impression that nobody knew really what to do because earned time credit is not usually applied to a parole release date and the ODOC computer systems were not designed to add that data. She said she would call Defendant Nowak to get an update. She encouraged Plaintiff to "wait out the process" and not file anything with the court until Plaintiff received a response from OISC.

116.    On or about August 8, 2012, Defendant Hatfield informed Plaintiff that Defendant Nowak told her that a "team of DOJ attorneys" were working on the issue and that the next meeting was scheduled for August 13, 2012. Hatfield said her impression was that the ODOC and BOPPPS were trying to figure out "any way to defeat his claim."

117.    On or about August 9, 2012, Plaintiff met with Defendant Beal who printed out his updated ETC computations from the ODOC's Corrections Information Systems. She said OISC instructed her to calculate and enter his ETC information, and explained that OISC now had the responsibility for applying the credits Plaintiff earned to his incarceration term.

Defendant Beal asked Plaintiff whether the victims had been notified about what was going on. Plaintiff told her that was the ODOC's responsibility. She said that she doubted whether Plaintiff would be released without the entire state being outraged and that anywhere Plaintiff paroled to would be difficult for people to accept.

118.    The August 9, 2012, Corrections Information Systems ETC Form that Defendant Beal printed out for Plaintiff, as alleged in paragraph 117, *supra*, establishes that Plaintiff had earned 1,929.75 days of ETC, between April 10, 1991 and May 29, 2012.

119.    From August 9, 2012 to the present, Defendants refused to apply the 1,929.75 days of ETC to Plaintiff's 336-month incarceration term and February 22, 2018 release date.

120.    Had OISC properly applied the 1929.75 days of ETC as shown on ODOC's Corrections Information Systems as of August 9, 2012, his February 22, 2018, his release date would have been reduced to approximately November 11, 2012.

121.    On or about August 10, 2012, Plaintiff informed Defendant Taylor that pursuant to OAR 291-109-0160(1)(c) OISC was required to respond to his grievance within twenty-one (21) days. Plaintiff also informed Defendant Taylor that, under OAR 291-109-0120(4), ODOC officials were required to make every effort to respond to his kites within seven (7) days, but had failed to do so. Plaintiff told her that OISC had also failed to respond to his public record request, which they were required to respond to under ORS 192.440(2) "as soon as practicable and without unreasonable delay."

122.    On or about August 10, 2012, Defendant Taylor told Plaintiff she contacted Defendant Smith and informed her that his grievance response was due August 10, 2012. Defendant Taylor said Defendant Smith told her that the DOJ had the matter under advisement

and would likely have an answer by next week. She said Defendant Smith told her she could not communicate by email internally or to the public on this subject per DOJ instruction.

123.    On or about August 10, 2012, Defendant Taylor told Plaintiff that she spoke to Defendant Persson. Defendant Taylor said she told Defendant Persson that the grievance response deadline had expired and that Smith's response was not acceptable. She told Plaintiff that Defendant Smith called Defendant Persson by telephone to verify what she said to Defendant Taylor and to tell him that the DOJ had instructed her not to respond. Defendant Taylor said that she told Defendant Persson that she just wanted to "cover her bases" because she did not want to get sued. Defendant Taylor said Defendant Persson told her she had nothing to worry about and he approved Defendant Smith's response.

124.    On or about August 10, 2012, Plaintiff showed Defendant Taylor his August 9, 2012 Corrections Information Systems ETC Form, described in paragraph 117, *supra*. She said that it showed that his claim was serious, but the "real issue" everyone is having a problem with is how an inmate is telling the "smart people" how things should work.

125.    On or about August 13, 2012, G. Engweiler spoke by telephone with Defendant Nowak, who told him to FAX his request for the policy that Defendant Smith said precluded ETC for juveniles.

126.    On or about August 13, 2012, ODOC officials, including Defendants Morrow, Steward, Griggs, Hall, Smith, Nowak, Lovejoy, and Doe(s) met to discuss Plaintiff's claim for ETC and release.

127.    On or about August 14, 2012, Defendant Taylor informed Plaintiff about the August 13, 2012 ODOC meeting, referenced in paragraph 126, *supra*, stating that the likely

reason for the meeting was to discuss "vicarious liability" because "everyone knows OISC screwed up" and that Plaintiff is supposed to be released.

128.    On or about August 14, 2012, Plaintiff told Defendant Taylor that he disagreed with OISC's failure to respond to his grievance. She said that there was nothing she could do and Defendant Persson had approved it. Plaintiff told her that this deprived him of due process because Plaintiff could wait indefinitely for a response. Plaintiff told her that OISC had not even responded to his kites. Plaintiff asked her if he could file a grievance appeal. Defendant Taylor said that she would deny it, because he first needed to receive a response from OISC. She said that DOJ was calling the shots and telling everyone to "keep silent."

129.    On or about August 15, 2012, Defendant Taylor hand-delivered OISC's response to Plaintiff's July 19, 2012 grievance. OISC's response was dated August 14, 2012, and stated only: "This matter is under review. We will get back to you." The grievance response was signed by Defendants Welsh, Nowak, and Doe #1.

130.    On or about August 15, 2012, Defendant Taylor told Plaintiff that DOJ had advised OISC how to respond to Plaintiff's grievance and to any other inquiries regarding his claim. She said that even though it was "technically" a response, it was not actually a response from which Plaintiff could file an appeal. She said that no one wants to answer his claim and that this is how "they" will drag it out.

131.    On or about August 15, 2012, Plaintiff told Defendant Taylor that the ODOC had a constitutional duty to respond to his claim. She advised him to file suit to enforce his rights. Defendant Taylor said that she believed that DOJ was intentionally avoiding giving an answer because they know Plaintiff is right but no one wants to be responsible for the "screw-up." She

said that Plaintiff could take solace in the fact that Plaintiff would eventually get paid for being unlawfully incarcerated.

132.   On or about August 15, 2012, Planitiff filed a grievance appeal of OISC's August 14, 2012 response. Plaintiff told Defendant Taylor that he was filing it to exhaust his administrative remedies and to give the ODOC a chance to properly respond.

133.   On or about August 16, 2012, Plaintiff filed a request for Attorney General review of OISC's failure to respond to his public record request for the OISC "policy" purportedly precluding ETC.

134.   On or about August 17, 2012, Plaintiff's attorney spoke to Defendant Lovejoy by telephone. He said that Defendant Lovejoy would not give a deadline for when a response would be given to Plaintiff. Plaintiff's counsel said Defendant Lovejoy told him "it could be one day or several weeks." He said Defendant Lovejoy told him that a group of DOJ attorneys were working on it and that Defendant Lovejoy was not "the top of the food chain" on this matter. He expressed his impression that Defendant Lovejoy had "little concern" for his claims and appeared to be in no hurry to respond any time soon.

135.   On or about August 17, 2012, Plaintiff received OISC's August 14, 2012 response to all but one of his kites, described in paragraphs 78, 89, 91, *supra*, each stating that: "This matter is under review. We will get back to you."

136.   On or about August 22, 2012, Defendant Taylor returned Plaintiff's grievance appeal, explaining that the appeal would not be processed "as there is nothing to appeal until OISC provides a written response." She told Sopher and Plaintiff together in the OSCI library that Persson had instructed her to inform Plaintiff that his grievance appeal will not be processed until OISC gives a written response. She again told Plaintiff to file suit against the ODOC.

Defendant Taylor said that the DOJ is telling the ODOC not to respond to inquiries about Plaintiff's and Sopher's release date. She said that the ODOC is "upset" because Plaintiff knows too much about the law. She told them that everyone knows Sopher and Plaintiff are right and entitled to release but nobody wants to be responsible. She told them that: "God has a plan and will make this right in the end."

137.    On or about August 22, 2012, OSCI Transitional Coordinator Kim Hollingsworth ("Hollingsworth") told Plaintiff that she had contacted Defendant Hall and asked whether she should continue working on Plaintiff's transition plan for release. She said that Defendant Hall said he could not comment on the matter. She said that she believed everyone had been "gagged" by DOJ.

138.    On or about August 27, 2012, Defendant Nowak responded by letter to G. Engweiler's August 13, 2012 request for OISC's policy regarding ETC, informing him that the policy was fourteen (14) pages and would cost him $7.00.

139.    On or about August 28, 2012, Plaintiff received a memo from Catherine Thompson at OISC dated August 23, 2012, stating that Plaintiff could receive the OISC policy Plaintiff requested on July 22, 2012, which was thirteen (13) pages, by sending a $13.00 to OISC. Plaintiff mailed his money withdrawal request that evening.

140.    On or about August 29, 2012, Sopher requested notary services and was sent to Defendant Beal, who instructed him not to ask her any questions about his time served, ETC, or release date.

141.    On or about August 29, 2012, Plaintiff received a letter dated August 23, 2012, from Assistant Attorney General Mary Williams ("Williams") in response to his August 16, 2012, request for Attorney General review of OISC's failure to provide the "policy" purportedly

Page 28 of 59 – COMPLAINT

denying him ETC. In her letter, Williams stated that OISC had agreed to provide the policy once Plaintiff sent a money withdrawal form.

142. On or about August 29, 2012, Defendant Hatfield informed Plaintiff that there was another "big meeting" set for August 31, 2012, involving the same officials that met on August 13, 2012. *See* paragraph 126, *supra*.

143. On or about August 31, 2012, OSCI Mailroom Staff Stan Duran ("Duran") told Plaintiff that Hatfield said "a final decision would be made today at the ODOC's meeting."

144. On or about August 31, 2012, Hollingsworth informed Sopher and Plaintiff that she believes "downtown" is most concerned about his litigation against them. She said that they are "upset" because Plaintiff keeps pushing legal claims. She also said that no one will respond to her emails about this matter, but that she is just going to continue planning for Sopher's and Plaintiff's release.

145. On or about September 2, 2012, Plaintiff learned that Hollingsworth had informed one of her inmate clerks that ODOC Administrators were saying that Sopher and Plaintiff know "too much about the law."

146. On or about September 3, 2012, Plaintiff spoke with Hollingsworth's clerk(s) who confirmed her statements, referenced in paragraph 145, *supra*.

147. On or about September 3, 2012, Plaintiff sent a kite to Defendant Persson, requesting a meeting to discuss his ETC and release claims, and asking to be informed as to the status of the August 31, 2012 meeting, alleged in paragraph 142, *supra*. Plaintiff reminded Defendant Persson of ODOC's constitutional duty to respond to Plaintiff's overdetention claim.

148.    On or about September 5, 2012, Plaintiff wrote to Defendants Lovejoy, Morrow, and Smith and requested that they provide him with ETC and release him. Plaintiff specifically informed those officials that they were violating his constitutional rights.

149.    On or about September 7, 2012, Plaintiff received the OISC policy that purportedly denied ETC. The policy does not state that juvenile offenders, like Plaintiff, are ineligible for ETC.

150.    The OISC policy purportedly denying ETC was not, and has never been, adopted pursuant to the APA rulemaking requirements under ORS chapter 183, as required by ORS 421.121(4), and was therefore invalid and *ultra vires. See* ORS 183.400(4)(c) (rule invalid if it was not adopted in accordance with rulemaking procedures).

151.    On or about September 9, 2012, Plaintiff filed a grievance against Defendant Welsh for failing to investigate and respond to Plaintiff's July 16, 2012 request for time served credit. *See* ODOC Grievance Complaint No. OCSI_2010_09_017.

152.    On or about September 9, 2012, Plaintiff filed grievances against Defendants Worley and Nowak regarding the OISC policy, referenced in paragraph 149, *supra. See* ODOC Grievance Complaint Nos. OSCI_2012_09_018; OSCI_2012_09_019.

153.    On or about September 10, 2012, Defendant Persson responded to Plaintiff's September 4, 2012 kite by simply referring him to OISC and not addressing his overdetention claim.

154.    On or about September 12, 2012, Plaintiff wrote to Defendant Worley requesting a stay of the OISC policy and any ODOC rules that were inconsistent with *Engweiler I.* Defendant Worley did not respond to that request, and Plaintiff subsequently filed a rule

challenge under ORS 183.400 in the Oregon Court of Appeals. *See Engweiler v. DOC,* Court Appeals Case No. A152445.

155.    In the early morning of September 13, 2012, Plaintiff sent a kite to Defendant Smith requesting an update on his July 16, 2012 kite and his July 20, 2012 grievance.

156.    On or about September 13, 2012, Plaintiff spoke with Defendant Taylor in the late afternoon. She asked Plaintiff to explain his three new grievances and how they differed from the original grievance. Plaintiff told her that the OISC policy and ODOC rules needed to be repealed, which was Defendant Worley's responsibility. Defendant Taylor then told Plaintiff that "because DOJ will not let her dump our grievances" she will process them.

157.    During the September 13, 2012 conversation, Defendant Taylor asked Plaintiff "what did Shane [Sopher] file?" Plaintiff told her a habeas corpus petition. She said she wanted to know what it addressed. Plaintiff told her his ETC and time served credit. She asked if it identified her at all. Plaintiff said "yes."

158.    During their September 13, 2012 conversation, Defendant Taylor told Plaintiff that OISC had responded to his July 19, 2012, grievance. Plaintiff asked her if she could get him the OISC response today, and she said she would try but she needed to talk to someone first. She told Plaintiff that he really just needed to "take it to court."

159.    It was clear to Plaintiff that Defendant Taylor had not intended to reveal that OISC had responded to his grievance and she was reluctant to produce the response.

160.    At Plaintiff's insistence, on or about September 13, 2012, Defendant Taylor gave Plaintiff the September 4, 2012 OISC grievance response, which was signed by Defendants Welsh and Arendell.

Page 31 of 59 – COMPLAINT

161.    The September 4, 2012 OISC grievance response stated that: "It is DOC policy as reflected in Oregon Administrative Rule 291-097-0005(3)(e) to not calculate earned time for inmates serving life sentences. Per statute, the [BOPPPS] establishes the parole release date for inmates serving life sentences and they have set a parole release date of February 22, 2018."

162.    Defendant Taylor told Plaintiff that the September 4, 2012 grievance response was "stupid" and that the appeal would be a "waste of time," but that the DOJ had said she needed to make sure the process was completed.

163.    OISC's September 4, 2012 grievance response is materially indistinguishable from the August 29, 2001, denial of ETC referenced in paragraph 33, *supra*.

164.    The September 4, 2012, grievance response did not respond to Plaintiff's claim that *Engweiler I* required ODOC to make an ETC reduction to the term incarceration.

165.    On or about September 4, 2012, Defendants Welsh and Arendell knew, or reasonably should have known, that ODOC's and OISC's rules and policy were inconsistent with the Oregon Supreme Court's April 13, 2006 authoritative decision in *Engweiler I* and were, therefore, invalid and *ultra vires*, and that by retroactively applying those laws, Plaintiff's constitutional rights would be violated, as alleged herein.

166.    Presumably Defendants Smith, Nowak or Doe(s) have a duty to maintain OISC policies that are in accordance with state and federal law, and they have the duty to amend or repeal OISC policies which violate state and federal law.

167.    On or about September 13, 2012, Plaintiff filed his grievance appeal to OISC's September 4, 2012 grievance response.

168.    On or about September 14, 2012, Defendant Taylor informed Plaintiff that she needed him to remove "compensation" from his grievances and grievance appeal because per

Page 32 of 59 – COMPLAINT

ODOC policy Plaintiff cannot be financially compensated for ODOC errors. Plaintiff told her that he only sought compensation for violations of his liberty rights, and that the federal court requires that Plaintiff express his claim. She asked him who his attorney was and why Plaintiff had not filed an action in the court. Plaintiff told her he believed in ODOC's process. Defendant Taylor told Plaintiff that he needed to "take it to court" and that although she'll process his grievance(s) and appeals, "it won't go nowhere." She said that Defendant Worley is not responsible at all for this "screw-up" and that it is all OISC and DOJ. Plaintiff told her that he would be filing two more grievances based on retaliation for his litigation activities. Plaintiff also explained *ex post facto* laws to her.

169.    No ODOC rule precludes inmates from requesting compensation in grievances even though ODOC will not or cannot provide it.

170.    On or about September 14, 2012, Plaintiff learned that Defendant Doe(s) had altered ODOC computer records by deleting 253.75 days of Plaintiff's ETC between August 17, 2009 and May 28, 2012.

171.    Plaintiff was neither notified nor given any opportunity to be heard prior to or after Defendant Doe(s) deletion of 253.75 days of Plaintiff's ETC.

172.    On or about September 14, 2012, Plaintiff filed two grievances against "Unknown DOC and OISC officials" for retaliatory conduct and for depriving him of 253.75 days of ETC without due process.

173.    On or about September 17, 2012, Defendant Taylor told Plaintiff to explain his latest grievances. After he did as instructed, she informed him that she would process his grievances. She again urged Plaintiff to "take [his claim] to court."

174.    On or about September 18, 2012, Defendant Taylor provided Plaintiff with "Inmate Complaint Receipt Memo[s]" for his grievances and grievance appeals, described above.

175.    On or about September 19, 2012, Plaintiff spoke with Defendant Hatfield. She said she was surprised that Sopher and Plaintiff had not been released. She said that she debated with them about what "term of incarceration" meant. She said BOPPPS told her that they thought that it meant a minimum sentence, and not the term they set. Defendant Hatfield told Plaintiff that, in her opinion, Defendant Taylor was going to be a defendant. She then jokingly asked Plaintiff to not name her as a defendant. She said that she anticipated DOJ would tell her to stop talking to Plaintiff once all the litigation gets going. She said she thought people were just not "understanding" *Engweiler I*.

176.    On or about September 19, 2012, OSCI Library Coordinator Greg Hunter told Plaintiff to "watch out" and not trust Defendants Taylor or Hatfield. He told Plaintiff to let him know if something bad happens.

177.    On or about September 20, 2012, Plaintiff received a written response from Defendant Smith to his July 23, 2012 kite asking her to clarify if she spoke with his father and Defendant Taylor. Defendant Smith wrote that she had spoken to his father but not Defendant Taylor.

178.    On or about September 21, 2012, Defendant Taylor informed Plaintiff that all of his grievances have been "suspended per Oregon Administrative Rule (OAR) 291-109-0140(3)(h) which provides that an inmate cannot grieve ' claims or issues for which the inmate has filed litigation in the court.'" Defendant Taylor returned Plaintiff's September 14, 2012 grievances for retaliation and due process violations, stating they would not be processed. She

Page 34 of 59 – COMPLAINT

informed Plaintiff that she received an urgent email from Defendant Jef VanValkenburg, "their

attorney," stating she needed to suspend all of Plaintiff's grievances. Plaintiff informed her that

his rule challenge only addressed the validity of ODOC rules and OISC policy. Plaintiff told her

that each of his grievances addresses separate issues and he believed that those issues would still

be addressed per grievance rule. In response Defendant Taylor said: "I told you to take it to

court, now go do it."

179.    On September 25 and 26, 2012, Plaintiff sent kites to Defendant Taylor requesting

that his grievances (OSCI_2012_07_027 A and OSCI_2012_09_019) and the grievance process

not to be suspended. Defendant Taylor, nor any other ODOC official, has ever respond to

Plaintiff's September 25 and 26, 2012 kites.

180.    On or about September 21, 2012, Defendant Hatfield informed Plaintiff that he

would be receiving an official statement from "someone high up" denying his claim and all

grievances from this point forward. Plaintiff has never received any such "official statement."

181.    On or about September 25, 2012, Defendants Welsh, Arendell, and Doe(s)

responded to Plaintiff's July 16, 2012 request for credit for time served and September 5, 2012

grievance, denying his request for time served credit for the day of February 22, 1990.

182.    On or about October 11, 2012, Plaintiff filed an original jurisdiction habeas

corpus petition in the Oregon Supreme Court, claiming that he was entitled to ETC and release

as of July 17, 2012. *See Engweiler v. Persson,* Supreme Court Case No. S060793.

183.    On or about October 15, 2012, Defendant Nowak wrote Plaintiff, informing him

that OISC contacted Multnomah County Juvenile Detention and requested time served credit

from September 22, 1990 to September 23, 1990. In her letter, Defendant Nowak states that

"[o]n August 6, 2012, OISC was informed that [Plaintiff's] record no longer existed and therefore they could not certify this time."

184.    On or about October 18, 2012, Plaintiff wrote Defendant Nowak in response to her October 15, 2012 letter. Plaintiff informed her that he had requested time served credit from February 22, 1990 to February 23, 1990, and not September 22, 1990 to September 23, 1990, as Defendant Nowak mistakenly believed. Plaintiff attached his prior request for time served credit and his Presentence Investigation Report (two pages) to support his claim. Plaintiff further informed Defendant Nowak that OISC had already previously credited Plaintiff with time served credit from September 22, 1990 to September 23, 1990. He again requested time served credit for the day of February 22, 1990. Defendant Nowak did not respond to Plaintiff's letter.

185.    On or about October 17, 2012, Plaintiff gave Notice of Injury and Tort Claim to Oregon Department of Administrative Services Director Michael Jordan, Defendant Peters, and Oregon Attorney General Ellen F. Rosenblum, explaining his ETC and overdetention claim and attaching a sworn declaration supporting many of the facts alleged in this complaint.

186.    On or about September 14, 2012, Plaintiff brought a rule challenge under ORS 183.400, specifically challenging the validity of *former* OAR 291-097-0005(3)(e).

187.    On or about October 11, 2012, Plaintiff filed an original jurisdiction petition for writ of habeas corpus in the Oregon Supreme Court. He claimed in his petition that DOC's application of *former* OAR 291-097-0005(3)(e) violated the federal Ex Post Facto Clause and that by depriving him of ETC and release, DOC had violated his procedural and substantive due process rights under the Fourteenth Amendment. The court issued the writ of habeas corpus.

188.    At no time in the state habeas corpus proceedings did DOC dispute Plaintiff's factual assertions that (1) he had earned ETC totaling 2,045.5 days or 20 percent of his 336-

month term of incarceration based on his appropriate institutional behavior; (2) DOC had not given him notice or a meaningful opportunity to be heard prior to or after the loss of his ETC; and (3) his release date, as adjusted by ETC, passed on July 17, 2012. In those proceedings, "DOC admit[ted] that if the [Oregon Supreme Court's] statements in [*Engweiler I*] are controlling, then ORS 421.121 now requires DOC to apply ETC to advance [Plaintiff's] initial release date."

189.    On or about December 12, 2013, the Oregon Supreme Court decided *Engweiler v. Persson/DOC,* 354 Or. 549, __ P.3d __ (2013) (*Engweiler III*), reaffirming its former April 13, 2006 decision in *Engweiler I* and holding once again that Plaintiff was entitled to ETC under ORS 421.121.

190.    The Oregon Supreme Court in *Engweiler III* found undisputed that ODOC had calculated 1,929.75 days of credit and that his adjusted July 17, 2012 release date had passed.

191.    The Oregon Supreme Court in *Engweiler III* concluded that ODOC's rules and policies could not be used to deny Plaintiff ETC or release.

192.    On December 12, 2013, the Oregon Supreme Court in *Engweiler III* ultimately denied Plaintiff habeas corpus relief based on the fact that BOPPPS had not yet "scheduled" his physical release from custody, taking into account his ETC that ODOC had refused to apply. The Court concluded that because the BOPPPS cannot "schedule" Plaintiff's release for a date in the past, Plaintiff's "physical release necessarily will be scheduled for a future date." The Court decided that the BOPPPS was authorized to schedule Plaintiff's release for a future date and to conduct a pre-release hearing under ORS 144.125 before that date. The Oregon Supreme Court noted that it "presume[d] that [BOPPPS] will commence and complete that process with appropriate dispatch following the issuance of [its] decision."

Page 37 of 59 – COMPLAINT

193.    On or about December 15, 2013, Plaintiff filed a petition for habeas corpus
pursuant to 28 U.S.C. § 2254. *See Engweiler v. Persson,* Case No.: 6:13-cv-02264-MC. Plaintiff
raised three claims under Article I, Section 10, Clause 1 (*ex post facto*) and the Fourteenth
Amendment (due process) of the United States Constitution.

194.    As a direct result of Defendants' acts and inactions, Plaintiff was irreparably
harmed by the loss of his liberty interests in ETC and his July 17, 2012, adjusted release date.

**Defendants' Violations of Plaintiff's Constitutional Rights Subsequent to *Engweiler III***

195.    Even after Defendants received a judicial declaration of their wrongful practice of
not complying with ORS 421.121 in *Engweiler III*, Defendants continued to refuse to comply
with ORS 421.121 and took other adverse actions against Plaintiff in violation of his
constitutional rights until his release from confinement on October 16, 2014.

196.    Defendants Peters, Morrow, Worley, Smith, Nowak, Beal, and Doe(s) continued
to refuse to apply Plaintiff's ETC and reduce his 336-month initial release date after the Oregon
Supreme Court decided *Engweiler III*.

197.    Defendants Peters, Morrow, Worley, Smith, Nowak, and Doe(s) failed to formally
amend or repeal their respective rules and policies that were relied on to deny Plaintiff ETC.

198.    Defendants Nowak and Doe(s) promulgated a new policy providing that the
application of ETC to the prison term of an inmate serving a life sentence "simply moves the exit
interview [hearing] to an earlier date."

199.    Defendants Peters, Morrow, Worley, Smith, Nowak, and Doe(s) promulgated the
policy, described above, without compliance with Oregon's Administrative Procedures Act as
required by ORS 421.121(4).

200.    On April 18, 2014, Defendant Nowak provided inmate Jon Quintin Johnston notice of the policy described in the preceding paragraph in answer to his request for ETC. Nowak gave no similar notice to Plaintiff.

201.    Defendants Nowak and Doe(s) know, or reasonably should have known, that this policy is inconsistent with *Engweiler I* and *Engweiler III*, which require the reduction of ETC to an inmate's term of incarceration and not the next hearing date, and that the retroactive application of the policy would violate Plaintiff's constitutional rights.

202.    Defendants did not respond to Plaintiff's grievances, described in paragraphs 86, 152, 167, *supra*, or give him any meaningful opportunity to be heard on the issues raised in the grievances.

203.    Defendants never notified Plaintiff that the ODOC grievance process was available to address his ETC and release claims following Defendants' September 21, 2012 suspension of Plaintiff's grievance process.

204.    On or about February 4, 2014, BOPPPS informed Plaintiff in Board Action Form No. 10 that it had "been notified by the Department of Corrections Offender Information and Sentence Computation office that inmate's calculated earned date on [his 336 month prison] term would be July 18, 2012[.]" OISC Defendants did not similarly provide Plaintiff notice of its calculation of his earned date..

205.    Plaintiff disputes OISC's calculation of his earned date that it purportedly provided to BOPPPS, as alleged in paragraph 204, *supra*; and, had he been given an opportunity to be heard, Plaintiff would have provided credible evidence that OISC's calculation was wrong.

### *Defendants' Failure to Timely Prepare Release Plan and Fabrication of False Information Resulting in Extended Confinement*

206.    On February 4, 2014, BOPPPS issued a Board Action Form ("BAF") to Plaintiff

stating that, pursuant to *Engweiler III* he was "entitled to have his prison term, as established by

the Board, reduced by earned-time credits under ORS 421.121." The BAF identified that

Plaintiff's prison term "was set at 336 months" and that DOC had notified the BOPPPS that his

"calculated earned date on this term would be July 18, 2012." BOPPPS ordered an exit interview

hearing under ORS 144.125 on May 13, 2014.

207.    ODOC has a legal duty under Oregon law to assist inmates with and prepare a

release plan prior to the inmate's release from prison.

208.    Defendants Beal and Doe(s) have previously assisted other inmate with preparing

release plans before their exit interview hearing under ORS 144.125.

209.    Defendants Beal and Doe(s) failed to assist Plaintiff with or prepare his release

plan prior to his exit interview hearing.

210.    On May 13, 2014, BOPPPS conducted Plaintiff's hearing under ORS 144.125

and, at the end of the hearing, closed the record for deliberation and final decision. BOPPPS

chairperson stated that it would not be considering additional records or letters. At that time, the

BOPPPS lacked evidence to support the deferral of Plaintiff's release date under ORS 144.125 or

the rules in effect at the time of his crime, requiring it to affirm his July 17, 2012 release date.

211.    On May 13, 2014, Defendant Lowe, who was assigned to supervise Plaintiff's exit

interview hearing, purportedly informed Defendant Carney at the hearing that, in his opinion,

Plaintiff had been dishonest in answering one of the BOPPPS questions concerning Plaintiff's

"romantic relationships." The information Defendant Lowe provided Defendant Carney is false.

212.    On information and belief, Defendant Lowe intentionally provided false

information to Defendant Carney for the malicious and improper purpose of depriving Plaintiff

of his parole release date. Defendant Lowe was motivated to do this based on a personal bias

Page 40 of 59 – COMPLAINT

including, a deep-seated fear of parolees and distrust of inmates. Defendant Lowe expressed to other prison staff and he was overheard by prison staff stating that Plaintiff's parole hearing "was the sickest shit he had ever heard." Defendant Lowe has a reputation with other prison staff and inmates as being a liar and/or exaggerator.

213.    On information and belief, Defendant Carney engaged in *ex parte* communication with one or all BOPPPS members by relating Defendant Lowe's false statement to them during their deliberative process.

214.    On May 16, 2014, BOPPPS informed Plaintiff that it had scheduled the continuation of his May 13, 2014 exit interview hearing on August 26, 2014. It stated that the continuation was "to consider an additional psychological evaluation (to include an evaluation of psychosexual factors), and the continued hearing will be limited to discussion of that evaluation."

215.    BOPPPS' decisions to continue Plaintiff's exit interview hearing and order a third psychological evaluation are highly unusual.

216.    On information and belief, BOPPPS based its decision to continue Plaintiff's May 13, 2014 exit interview hearing and order a third psychological evaluation, in part, on Defendant Carney's *ex parte* communication, alleged above.

217.    On or about May 30, 2014, Defendant Carney sent Defendant Lowe an email, asking whether he "would still be providing a statement" about his observations during inmate visitation. She stated that "[t]he Board would like to share that information with the psychologist before the inmate is evaluated." In her request, Defendant Carney asked Defendant Lowe to "[p]lease omit inmate's name from any email responses."

218.    On information and belief, Defendant Carney requested Defendant Lowe to omit Plaintiff's name from his email response in an effort to conceal their communications, which are public records.

219.    On or about May 30, 2014, Defendant Lowe provided a first version of his memo (dated May 28, 2014) to Defendant Carney by email. In that memo, Defendant Lowe stated that he witnessed Plaintiff and a female visitor "embrace" each other romantically on many occasions in the OSCI visiting room.

220.    On or about May 30, 2014, Defendant Carney sent Defendant Lowe an email, requesting him to elaborate on what he wrote in his memo. Defendant Carney requested that he describe what he meant by "romantic" because "others (defense) could perceive/argue this as a lesser behavior, like hugging or a peck on the cheek."

221.    On or about May 30, 2014, Defendant Lowe sent Defendant Carney an email, stating that "[i]t's no problem at all for me to edit [his memo] as many times as necessary! How [*sic*] this one?" In the revised version of his memo, Defendant Lowe added that he witnessed Plaintiff and female visitor engaged in "very, long passionate kisses as well as embraces."

222.    The behavior Defendant Lowe described in his second memo constitutes a violation of ODOC and OSCI visiting room rules. Inmates and visitors are only allowed a "brief" kiss and embrace at the beginning and end of visitation. Additional contact is defined as excessive contact. ODOC officials are instructed by rule and policy to sanction individuals who violate visiting room rules for excessive contact.

223.    BOPPPS is required to defer a prisoner's release date based on serious misconduct, which, by definition, would include the conduct alleged by Defendant Lowe.

224.    Defendant Lowe has an official duty to not write false reports.

225.     Defendant Lowe has an official duty to enforce ODOC and OSCI's rules.

226.     Neither Plaintiff nor his visitors have ever been sanctioned for violating visiting room rules for excessive contact.

227.     On June 6, 2014, Plaintiff met with the BOPPPS-contract psychologist Dr. Elena Balduzzi.

228.     On June 6, 2014, after his clinical interview with Dr. Elena Balduzzi, Plaintiff's counsel provided him a copy of Defendant Lowe's memo (second version). BOPPPS provided this information as part of a general public records request that Plaintiff's counsel made shortly after his May 13, 2014 exit interview hearing.

229.     After receiving Defendant Lowe's memo, Plaintiff's counsel made a second public records request for all records

230.     On or about June 9, 2014, Plaintiff filed a grievance against Defendant Lowe for providing false information to the BOPPPS. Plaintiff requested, among other things, Defendant Lowe's memo to be retracted.

231.     On or about June 27, 2014, Defendant Lowe responded to Plaintiff's grievance. In his response, Defendant Lowe provided an entirely different and inconsistent statement from what he stated in his second memo to Defendant Carney. He described a single incident that did not include "very long passionate kisses." Defendant Lowe did not correct or retract the false statement he provided to Defendant Carney in his second memo.

232.     On or about July 1, 2014, Plaintiff filed a grievance appeal, requesting, among other things, Defendant Lowe's memo be expunged from Plaintiff's record. Plaintiff identified that Defendant Lowe's statements to the BOPPPS and in his grievance response were inconsistent and false.

Page 43 of 59 – COMPLAINT

233.    On or about August 12, 2014, Defendant Persson responded to Plaintiff's grievance appeal. Persson confirmed the "discrepancies" Plaintiff identified in Lowe's memo and grievance response, but concluded that he could not provide Plaintiff's relief because Oregon Public Records Law did not authorize ODOC to retract or destroy public records. Defendant Persson's response was affirmed in a grievance appeal to the Assistant Director of ODOC.

234.    On or about August 14, 2014, three correctional staff provided sworn statements that directly contradicted Defendant Lowe's statements in his memo(s).

235.    On or about August 21, 2014, Plaintiff received the May 30, 2014 email exchange between Defendants Carney and Lowe, described above. BOPPPS provided this document as part of his counsel's second public records request. Based on that document, Plaintiff's counsel made a third public records request to BOPPPS, requesting all versions of the memo Defendant Lowe provided to Defendant Carney.

236.    On or about August 22, 2014, BOPPPS provided Plaintiff's counsel with Defendant Lowe's first version of his memo, described above. BOPPPS stated that it was the only other memo submitted to BOPPPS by Defendant Lowe.

237.    On August 26, 2014, BOPPPS held Plaintiff's continued exit interview hearing and accepted Defendant Lowe's memo into the record.

238.    On September 2, 2014, the BOPPPS issued Board Action Form No. 11, concluding that Plaintiff did not have a present severe emotional disturbance that constitutes a danger to the health or safety of the community. BOPPPS ordered Plaintiff's release on parole as of that day, but deferred his release for forty-five (45) days pending receipt of an adequate plan from ODOC.

239.    Had Defendants Lowe and Carney not fabricated and provided BOPPPS false information about Plaintiff, described in the previous paragraphs, the BOPPPS would not have continued Plaintiff's May 18, 2014, exit interview hearing, which extended his incarceration.

240.    Had Defendants Lowe and Carney timely disclosed and not deliberately concealed the false information about Plaintiff, referenced in the previous paragraph, Plaintiff would have had a meaningful opportunity to respond to and correct it.

241.    Had Defendants Beal and Doe(s) assisted Plaintiff with and prepared an adequate release plan, Plaintiff release would not have been deferred forty-five (45) days, nor unnecessarily delayed the full forty-five (45) days after the BOPPPS issued its September 2, 2014 release order.

242.    On October 16, 2014, Plaintiff was released from custody onto parole.

243.    Shortly after Plaintiff's release, the district court dismissed as moot his federal habeas corpus petition based on the fact that he had been released from custody.

244.    Unless enjoined, Defendants individually and collectively will continue to engage in the unlawful acts and the pattern and practices of retaliatory conduct described above. Plaintiff has no adequate remedy at law. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendants' unlawful acts and pattern and practices of retaliatory conduct unless this Court provides relief. Accordingly, Plaintiff is entitled to injunctive relief.

## CLAIMS FOR RELIEF

### First Claim for Relief:
### (8th and 14th Amends., U.S. Const.—Failure to Investigate and Respond)

245.    Plaintiff re-alleges each and every allegation of paragraphs 1 through 244 and incorporates those allegations herein by this reference.

246.    This claim involves Defendants Morrow, Peters, Steward, Griggs, Hall, Smith, Nowak, Arendell, Welsh, Worley, Persson, Hatfield, Taylor, Beal, Valkenburg, Lovejoy, Rice and Doe(s).

247.    After Plaintiff put Defendants individually and collectively on notice and presented credible evidence of his claim that he was entitled to ETC and that he was being overdetained, Defendants refused to investigate in good faith or respond to Plaintiff's claim.

248.    Instead of investigating Plaintiff's overdetention claim, Defendants acted, individually and collectively in bad faith, maliciously and unreasonably:

    a.    To delay and deny Plaintiff his liberty interests in ETC and adjusted release date;

    b.    In an effort to relitigate *Engweiler I*;

    c.    To retaliate against Plaintiff for his former protected litigation against Defendants;

    d.    To avoid liability for violating Plaintiff's statutory and constitutional rights;

    e.    Due to Defendants' animus toward Plaintiff for knowing the law and exercising his fundamental constitutional right to access the courts and seek redress of grievances; and/or

    f.    Because of the "politic" involving Plaintiff's case.

249.    Defendants individually and collectively knew, or reasonably should have known, that by intentionally refusing to respond to the credible evidence of Plaintiff's ETC and release date claim, (*i.e.*, the Oregon Supreme Court's authoritative April 13, 2006 decision in *Engweiler I*), Plaintiff's constitutional rights would be violated and that he would lose his ETC and be overdetained well beyond his July 17, 2012 adjusted release date.

250.    Defendants' acts and omissions alleged herein constitute deliberate indifference in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

### Second Claim for Relief:
### (14th Amend. U.S. Const.—Procedural Due Process)

251.    Plaintiff re-alleges each and every allegation of paragraphs 1 through 244, and incorporates those allegations herein by this reference.

252.    This claim involves Defendants Morrow, Peters, Steward, Griggs, Hall, Smith, Nowak, Arendell, Welsh, Worley, Persson, Hatfield, Taylor, Beal, Valkenburg, Lovejoy, Rice and Doe(s).

253.    Under Oregon law, Plaintiff has protected liberty interests in his ETC and his adjusted parole release date.

254.    Defendants deprived Plaintiff of his liberty interests in ETC and his adjusted release date without due process by:

a.    Failing to provide Plaintiff a hearing before Defendants chose to extend Plaintiff's custodial period by refusing to adjust his February 22, 2018 release date to July 17, 2012, as required by *Engweiler I* and *Engweiler III*;

b.    Failing to properly promulgate rules and policies providing a constitutionally adequate process for the granting, retracting, and restoration of Plaintiff's ETC;

c.    Refusing to provide notice of, and direct access to, policies promulgated and used by ODOC and OISC in determining whether an inmate is entitled to ETC under ORS 421.121;

d.    Refusing to properly and timely calculate and apply Plaintiff's ETC to his 336 month term of incarceration in accordance with *Engweiler I* and *Engweiler v. Persson, supra*;

e.    Failing to provide Plaintiff notice of decisions concerning the calculation and application of ETC and/or to not change Plaintiff's release date in accordance with *Engweiler I* and/or *Engweiler III*;

f.    Failing to provide written procedures governing the disposition of and challenges to administratively established release dates in accordance with due process; and

g.    Failing to investigate and respond to Plaintiff's ETC and overdetention claim without bias or prejudice toward Plaintiff.

255.   The acts and omissions of Defendants caused Plaintiff irreparable harm by depriving Plaintiff of ETC and adjusted release date.

256.   The acts and omission of Defendants deprived Plaintiff of procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

## Third Claim for Relief:
### (14th Amend. U.S. Const.—Substantive Due Process)

257.   Plaintiff re-alleges each and every allegation of paragraphs 1 through 244, and incorporates those allegations herein by this reference.

258.   This claim involves Defendants Morrow, Peters, Steward, Griggs, Hall, Smith, Nowak, Arendell, Welsh, Worley, Persson, Hatfield, Taylor, Beal, Valkenburg, Lovejoy, Rice and Doe(s).

259.   Under Oregon law, Plaintiff has protected liberty interests in his ETC and his adjusted parole release date.

260.   Defendants' arbitrary and intentional refusal to comply with ORS 421.121, as authoritatively interpreted in *Engweiler I* and reaffirmed in *Engweiler III,* violated Plaintiff's right to due process

261.   Defendants have deprived Plaintiff of his right to substantive due process in violation of the Fourteenth Amendment to the United States Constitution.

## Fourth Claim for Relief:
### (1st and 14th Amends. U.S. Const.—Retaliation)

262.   Plaintiff re-alleges each and every allegation of paragraphs 1 through 244, and incorporates those allegations herein by this reference.

263.    This claim involves Defendants Morrow, Peters, Steward, Griggs, Hall, Smith, Nowak, Arendell, Welsh, Worley, Persson, Hatfield, Taylor, Beal, Valkenburg, Lovejoy, Rice, Carney and Doe(s).

264.    Defendants individually and jointly have engaged in and continue to engage in an improper, escalating pattern and practice of retaliation against Plaintiff including, but not limited to, the following:

a.    Refusing to calculate and apply Plaintiff's ETC and reduce his 336 month term of incarceration in accordance with state law;

b.    Promulgating and retroactively applying invalid, *ultra vires* administrative rules and policies to deprive Plaintiff of ETC and early release;

c.    Refusing to investigate in good faith and respond to Plaintiff's claim to ETC and to overdetention beyond his July 17, 2012 adjusted release date;

d.    Interfering with Plaintiff's grievance review process;

e.    Refusing to provide Plaintiff with due process in calculating, applying, and retracting his ETC;

f.    Refusing to comply with state law;

g.    Creating and providing false information to the BOPPPS and its contract psychologist, and then attempting to conceal the records showing how that information was improperly created;

h.    Refusing to assist Plaintiff with and prepare a release plan;

i.    Delaying completion of a release plan subsequent to release being ordered; and

j.    Subjecting Plaintiff to disparate and significantly harsher treatment than afforded to similarly situated offenders, chilling Plaintiff's exercise of his fundamental constitutional right to access the courts.

265.    The acts and omissions of Defendants, alleged in the previous paragraphs, were taken in direct response to Plaintiff's involvement in *Engweiler I, Engweiler III,* and in accessing the courts over many years.

266.    The adverse actions of Defendants, alleged herein, were and are motivated by a desire and intent to improperly deprive Plaintiff of ETC and his adjusted release date, and to improperly chill or otherwise interfere with and impede his protected First and Fourteenth Amendment rights to access the courts.

267.    The adverse actions of Defendants, alleged herein, are not supported by any legitimate penological interest and were arbitrary and capricious.

268.    As a result of Defendants' adverse actions, Plaintiff was deprived of his ETC and adjusted release date, and his incarceration term was prolonged.

269.    The acts and omission of Defendants, alleged above, have improperly chilled Plaintiff's exercise of his First and Fourteenth Amendment rights under the United States Constitution and inflicted tangible injuries upon him, in violation of those constitutional rights.

### Fifth Claim for Relief:
### (Article I, § 10, cl. 1 U.S. Const.—Ex Post Facto)

270.    Plaintiff re-alleges each and every allegation of paragraphs 1 through 244, and incorporates those allegations herein by this reference.

271.    This claim involves Defendants Morrow, Peters, Steward, Griggs, Hall, Smith, Nowak, Arendell, Welsh, Worley, Beal, Valkenburg, Lovejoy, Rice and Doe(s).

272.    Defendants retroactively applied *former* OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and the OISC policies to Plaintiff, whose crimes occurred before the effective date of that rule and those policies.

273.    The retroactive application of *former* OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and the OISC policies to Plaintiff create a significant risk and result of increasing Plaintiff's punishment in one or more of the following particulars:

a.    Making Plaintiff ineligible for ETC reductions;

b.     Canceling ETC that Plaintiff had earned;

c.     Reducing the total amount of ETC Plaintiff could earn against his 336 month incarceration term;

d.     Lengthening his term of incarceration, as reduced by ETC, beyond July 17, 2012;

e.     Depriving him of a substantive reduction to his term of incarceration.

274.    Defendants knew, or reasonably should have known, that by retroactively applying *former* OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and the OISC policies to Plaintiff, it would cause irreparable injury, in the loss of ETC and his overdetention after July 17, 2012.

275.    Defendants' retroactive application of OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and the OISC policy violated, Plaintiff's right not to be punished by *ex post facto* laws under Article I, Section 10, Clause 1 of the United States Constitution.

### Sixth Claim for Relief:
### (14th Amend. U.S. Const.—Procedural Due Process)

276.    Plaintiff re-alleges each and every allegation of paragraphs 1 through 244, and incorporates those allegations herein by this reference.

277.    Because Plaintiff has a liberty interest in his ETC and early release, he has a liberty interest in the accuracy of his prison/parole file.

278.    Defendants Lowe and Carney violated Plaintiff's right to due process by creating, attempting to conceal the process by which the information was created, and relating false information to BOPPPS and its contract psychologist after Plaintiff's May 13, 2014 exit interview hearing.

279.    The false information was relied upon by the BOPPPS to continue Plaintiff's May 13, 2014, exit interview hearing, which lengthened the duration of his incarceration.

280.    The process provided to attempt to expunge the false information from Plaintiff's prison/parole file was inadequate in that it did not authorize prison officials to expunge the false information from his file.

281.    The acts and omission of Defendants deprive Plaintiff of procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

### Seventh Claim for Relief:
### (42 U.S.C. § 1983—Civil Rights Conspiracy)

282.    Plaintiff re-alleges each and every allegation of paragraphs 1 through 244, and incorporates those allegations herein by this reference.

283.    A civil conspiracy and meeting of the minds existed, and continues to exist, between two or more of the Defendants in this action to deprive Plaintiff's of his constitutional rights in the manner alleged in one or more of Claims 1-6, *supra*, and one or more of said Defendants have engaged in overt unlawful act(s) in furtherance of the said conspiracy, resulting in damages to Plaintiff, including the irreparable loss of Plaintiff's liberty interests.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Court will enter a Judgment in his favor, and against Defendants, as follows:

A.    Grant declaratory judgment, declaring that:

1.    On December 12, 2013, the Oregon Supreme Court found that it is undisputed that ODOC had calculated 1,929.75 days of credit and that Plaintiff's adjusted July 17, 2012 release date had passed.

2.    Between July 17, 2012 to October 16, 2014, Defendants refused to apply Plaintiff's ETC under ORS 421.121 and reduce his 336-month term of incarceration, as authoritatively decided by the Oregon Supreme Court in *Engweiler I* and *Engweiler III*.

3.     After Plaintiff repeatedly put Defendants individually and collectively on notice and presented credible evidence of his claim that he was entitled to ETC and that he was being overdetained, Defendants refused to investigate in good faith or respond to Plaintiff's claim.

4.     Instead of investigating Plaintiff's overdetention claim, Defendants acted individually and collectively in bad faith, maliciously and unreasonably:

a.     To delay and deny Plaintiff his liberty interests in ETC and his adjusted release date;

b.     In an effort to relitigate *Engweiler I*;

c.     To retaliate against Plaintiff for his former protected litigation against Defendants;

d.     To avoid liability for violating Plaintiff's statutory and constitutional rights;

f.     Due to Defendants' animus toward Plaintiff for knowing the law and exercising his fundamental constitutional right to access the courts and seek redress of grievances; and

g.     Because of the "politic" involving Plaintiff's case.

5.     Defendants individually and collectively knew, or reasonably should have known, that by intentionally refusing to respond to the credible evidence of Plaintiff's ETC and release date claim, (*i.e.*, the Oregon Supreme Court's decision in *Engweiler I*), Plaintiff's constitutional rights would be violated and that he would lose his ETC and be overdetained beyond his July 17, 2012 adjusted release date.

6.     Defendants' acts and omissions alleged herein constitute deliberate indifference in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

7.     Under Oregon law, Plaintiff has protected liberty interests in his ETC and July 17, 2012 adjusted release date.

8.     Defendants were and are biased and prejudiced against Plaintiff and have

displayed a deep-seated antagonism toward him.

9.     Defendants deprived Plaintiff of his liberty interests in ETC and adjusted release

date without due process by:

a.     Failing to provide Plaintiff a hearing before Defendants chose to extend Plaintiff's
custodial period by refusing to adjust his February 22, 2018 release date to July
17, 2012, as required by *Engweiler I* and *Engweiler III*;

b.     Failing to properly promulgate rules and policies providing a constitutionally
adequate process for the granting, retracting, and restoration of Plaintiff's ETC;

c.     Refusing to provide notice of, and direct access to, policies promulgated and used
by ODOC and OISC in determining whether an inmate is entitled to ETC under
ORS 421.121;

d.     Refusing to properly and timely calculate and apply Plaintiff's ETC to his 336
month term of incarceration in accordance with *Engweiler I* and *Engweiler v.
Persson, supra*;

e.     Failing to provide Plaintiff notice of decisions concerning the calculation and
application of ETC and/or to not change Plaintiff's release date in accordance
with *Engweiler I* and/or *Engweiler III*;

f.     Failing to provide written procedures governing the disposition and challenges to
administratively established release dates in accordance with due process; and

g.     Failing to investigate and respond to Plaintiff's ETC and overdetention claim
without bias or prejudice toward Plaintiff.

10.    The acts and omissions of Defendants subject Plaintiff to irreparable harm by

depriving Plaintiff of ETC and an adjusted release date.

11.    The acts and omission of Defendants deprive Plaintiff of procedural due process

in violation of the Fourteenth Amendment to the United States Constitution.

12.    Defendants' arbitrary and intentional refusal to comply with ORS 421.121, as

authoritatively interpreted in *Engweiler I* and reaffirmed in *Engweiler III*, deprive Plaintiff of due

process, in violation of the Fourteenth Amendment to the United States Constitution.

Page 54 of 59 – COMPLAINT

13.     Defendants have deprived Plaintiff of his right to substantive due process in

violation of the Fourteenth Amendment to the United States Constitution.

14.     Defendants individually and jointly have engaged in and continue to engage in an

improper, escalating pattern and practice of retaliation against Plaintiff including, but not limited

to, the following:

a.      Refusing to calculate and apply Plaintiff's ETC and reduce his 336 month term of
        incarceration in accordance with state law;

b.      Promulgating and retroactively applying invalid, *ultra vires* administrative rules
        and policies to deprive Plaintiff of ETC and early release;

c.      Refusing to investigate in good faith and respond to Plaintiff's claim to ETC and
        to overdetention beyond his July 17, 2012 adjusted release date;

d.      Interfering with Plaintiff's fundamental constitutional right to seek redress of
        grievances;

e.      Refusing to provide Plaintiff with any due process protections in calculating,
        applying, and retracting his ETC;

f.      Refusing to comply with state law;

g.      Creating and providing false information to the BOPPPS and its contract
        psychologist, and then attempting to conceal the records showing how that
        information was improperly created;

h.      Refusing to assist Plaintiff with and prepare a release plan;

i.      Delaying completion of a release plan subsequent to release being ordered; and

j.      Subjecting Plaintiff to disparate and significantly harsher treatment than afforded
        to similarly situated offenders, chilling Plaintiff's exercise of his fundamental
        constitutional right to access the courts.

15.     The acts and omissions of Defendants were taken in direct response to Plaintiff's

involvement in *Engweiler I* through *III,* and in otherwise exercising his fundamental

constitutional rights to access the courts and seek redress of grievances.

16. The adverse actions of Defendants were and are motivated by a desire and intent to improperly deprive Plaintiff of ETC and July 17, 2012 adjusted release date, and to improperly chill or otherwise interfere with and impede his fundamental First and Fourteenth Amendment rights to access the courts and seek redress of grievances.

17. The adverse actions of Defendants are not supported by any legitimate penological interest and were, and are, arbitrary and capricious.

18. As a result of Defendants' adverse actions, Plaintiff has been deprives of his ETC adjusted release date.

19. The acts and omission of Defendants have improperly chilled Plaintiff's exercise of his fundamental First and Fourteenth Amendment rights to access the courts and seek redress of grievances and inflicted, and continue to inflict, significant tangible injuries upon him.

20. Defendants retroactively applied *former* OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and OISC policies to Plaintiff, whose crimes occurred before the effective date of that rule and those policies.

21. *Former* OAR 291-097-0005(3)(e) (*eff.* 8-4-2008), *renumbered as* OAR 291-097-0200(3)(e), and the OISC policies are invalid and *ultra vires*, as applied to Plaintiff, in that it exceeds the authority granted by ORS 421.121, as authoritatively interpreted in *Engweiler I* and *Engweiler III*.

22. The retroactive application of *former* OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and OISC policies to Plaintiff create a significant risk and result of increasing Plaintiff's punishment in one or more of the following particulars:

    a. Making Plaintiff ineligible for ETC reductions;

    b. Canceling ETC that Plaintiff had earned and is entitled to under ORS 421.121;

     c.      Reducing the total amount of ETC Plaintiff may earn against his 336 month incarceration term;

     d.      Lengthening his term of incarceration, as reduced by ETC, beyond July 17, 2012;

     e.      Depriving him of a substantive reduction to his term of incarceration.

23.     Defendants knew, or reasonably should have known, that by retroactively applying *former* OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and OISC policies to Plaintiff, they would cause him significant irreparable injury, in the loss of ETC and his overdetention.

24.     Defendants retroactive application of OAR 291-097-0005(3)(e) (*eff.* 8-4-2008) and OISC policies to Plaintiff violated his right not to be punished by *ex post facto* laws under Article I, Section 10, Clause 1 of the United States Constitution.

25.     Defendants have violated Plaintiff's right to due process by providing false information to the BOPPPS, which it relied on to prolong his incarceration.

26.     Defendants violated Plaintiff's right to due process by failing to provide adequate process that would allow for the expungement of false information in his prison/parole file.

27.     A civil conspiracy and meeting of the minds existed, and continues to exist, between two or more of the Defendants in this action to deprive Plaintiff's of his constitutional rights in the manner alleged, and one or more of said Defendants have engaged in overt unlawful act(s) in furtherance of the said conspiracy, resulting in damages to Plaintiff, including the irreparable loss of Plaintiff's liberty interests.

     B.      Grant injunctive relief, ordering Defendants and their agents and employees, to immediately:

     1.      Order Defendants Lowe and Carney to issue a written statement to Plaintiff and the BOPPPS acknowledging that they created materially false information in Lowe's May 28, 2014 memo;

Page 57 of 59 – COMPLAINT

2.      Order Defendant Persson to expunge from Plaintiff's prison file(s) Lowe's May

28, 2014 memo and any and all versions of it; and

3.      Cease any and all ongoing and future retaliation against Plaintiff.

C.      Grant Plaintiff nominal damages against each Defendant, jointly and separately, in

their individual capacities, for their violation of Plaintiff's constitutional rights, as alleged herein.

D.      Grant Plaintiff compensatory damages in an amount to be determined at trial

against each Defendant, jointly and separately, in their individual capacities, for their violation of

Plaintiff's constitutional rights, as alleged herein.

E.      Grant Plaintiff punitive damages in an amount to be determined at trial, against

each Defendant, jointly and separately, in their individual capacities for their willful, deliberate

and intentional violation of Plaintiff's constitutional rights by:

1.      Knowingly and willfully retaliating against Plaintiff for engaging in constitutionally protected conduct;

2.      Knowingly and willfully interfering with Plaintiff's fundamental constitutional right to seek redress of grievances;

3.      Knowingly and willfully interfering with Plaintiff's fundamental constitutional right to access the court;

4.      Knowingly and willfully acting, and refusing to act, in violation of ORS 421.121;

5.      Knowingly and willfully adopting and retrospectively applying invalid, *ultra vires* policies and rules to justify depriving Plaintiff of rights and protections guaranteed by ORS 421.121;

6.      Knowingly and willfully refusing to investigate Plaintiff's claims of improper deprivation of ETC and overdetention;

7.      Knowingly and willfully depriving Plaintiff of due process protections in relation to the denial of ETC credits he is entitled to under OR 421.121 as authoritatively construed by the Oregon Supreme Court in *Engweiler I* and *Engweiler III*;

8.      Knowingly and willfully detaining Plaintiff beyond July 17, 2012, in violation of ORS 421.121 authoritatively construed by the Oregon Supreme Court in *Engweiler I* and *Engweiler III*;

9.      Knowingly and willfully creating and providing false information to the BOPPPS, which was relied on to prolong Plaintiff's incarceration term, and then attempting to conceal the records showing how that information was improperly created; and

10.    Knowingly and willfully engaging in a civil conspiracy to violate state law and Plaintiff's constitutional rights, as alleged herein.

F.      Award Plaintiff reasonable costs, expenses and attorney fees, pursuant to 42 U.S.C. § 1988.

G.      Grant Plaintiff such further relief as this Court deems just and equitable under the circumstances.

**Pursuant to 28 U.S.C. § 1746(2), I hereby verify and declare under penalty of perjury that the foregoing is true and correct.**

DATED this 27 day of November, 2014.

Respectfully submitted,

Conrad Robert Engweiler
Plaintiff, *pro se*